# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:11-cv-19** |
| **v.** | ) |
| | ) |
| **EME HOMER CITY GENERATION L.P.,** | ) **MEMORANDUM OPINION** |
| **HOMER CITY OL1 LLC,  HOMER CITY OL2** | ) **AND ORDER OF COURT** |
| **LLC**, **HOMER CITY OL3 OLC, HOMER CITY** | ) |
| **OL4 LLC, HOMER CITY OL5 LLC, HOMER** | ) |
| **CITY OL6 LLC, HOMER CITY OL7, HOMER** | ) |
| **CITY OL8, NEW YORK STATE ELECTRIC** | ) |
| **AND GAS CORPORATION and** | ) |
| **PENNSYLVANIA ELECTRIC COMPANY,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| ─────────────────────── | ) |
| **COMMONWEALTH OF PENNSYLVANIA,** | ) |
| **DEPARTMENT OF ENVIRONMENTAL** | ) |
| **PROTECTION and STATE OF NEW YORK,** | ) |
| | ) |
| **Intervenor-Plaintiffs,** | ) |
| **v.** | ) |
| **EME HOMER CITY GENERATION L.P., et al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| ─────────────────────── | ) |
| **STATE OF NEW JERSEY,** | ) |
| | ) |
| **Intervenor-Plaintiff,** | ) |
| **v.** | ) |
| **EME HOMER CITY GENERATION L.P., et al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

1

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court are the following motions to dismiss: EME HOMER CITY GENERATION L.P.'S MOTION TO DISMISS (Doc. No. 85); DEFENDANTS HOMER CITY OWNER-LESSORS' MOTION TO DISMISS (Doc. No. 87); NEW YORK STATE ELECTRIC & GAS CORPORATION'S MOTION TO DISMISS (Doc. No. 88); and PENNSYLVANIA ELECTRIC COMPANY'S MOTION TO DISMISS (Doc. No. 91), each with a brief in support. Plaintiff United States of America and three intervenor Plaintiffs, Commonwealth of Pennsylvania Department of Environmental Protection ("PADEP"), State of New York and State of New Jersey (collectively the "Intervenors"), filed briefs in opposition. All Defendants filed reply briefs. The issues have been fully briefed and are ripe for disposition.


### Factual Background

This case involves alleged violations of the federal Clean Air Act, 42 U.S.C. § 7470 et seq., at the Homer City coal-fired power plant in Indiana County, Pennsylvania (the "Plant"). Although the legal issues raised in this case are complex, the facts pled in the three separate Complaints filed by the United States and the Intervenor state Plaintiffs are relatively straight-forward.

Defendant New York State Electric and Gas Corporation ("NYSEC") was an owner of the Plant from January 1968 until June 1998. Defendant Pennsylvania Electric Company ("PENELEC") was an owner of the Plant from January 1968 until March 1999 and also operated the Plant during this same timeframe.[1] Defendant EME Homer City Generation, L.P. ("EME") owned the Plant from March 1999 until December 7, 2001 and has operated the Plant from March 1999 through the present. In 2001, EME and the eight Homer City Owner-Lessor

---

[1] The intervenor complaints allege that NYSEC and PENELEC began construction of the Plant in 1965.

Limited Liability Companies (the "OLs") completed a sale-leaseback transaction, by which the OLs acquired ownership of the Plant. For clarity and convenience, NYSEC and PENELEC will be referred to as the "Former Owners" and EME and the OLs will be referred to as the "Current Owners."

The Plant has three coal-fired generating units. Units 1 and 2 began operating in 1969, prior to the enactment of the provisions of the Clean Air Act at issue, and neither unit has been retrofitted with a wet flue gas desulfurization scrubber to control SO2 emissions which adversely impact human health and the environment, including asthma and acid rain. In 2009, Units 1 and 2 emitted approximately 96,000 tons of SO2, amongst the highest in the nation.[2] All three boiler units are currently equipped with electro-static precipitators for particulate control and selective catalytic reduction for control of nitrogen oxides ("NOx").

In August 1991, the Former Owners commenced a multi-million dollar project to replace the economizer on Unit 2, which included modification of the backpass gas ductwork and installation of new reheat temperature control dampers and internal boiler supports and related work. In March 1994, the Former Owners commenced a similar project to replace the economizer on Unit 1. In 1995 and 1996, the Former Owners replaced the vertical reheater pendants on Units 1 and 2.[3] The Former Owners did not apply for or obtain a permit under the Prevention of Significant Deterioration ("PSD") program of the Clean Air Act before performing any of these projects.

On August 3, 1995, PENELEC submitted an application for an operating permit for the Plant pursuant to the requirements of Title V of the Clean Air Act. On January 30, 2004, PADEP issued a final Title V permit for the Plant. The effective date of the permit was

---

[2] Unit 3, which is not at issue in this case, began operation in 1977 and is equipped with a scrubber.
[3] The Intervenors, but not the United States, contend that the vertical reheater pendant projects violated the PSD program.

December 1, 2004.  United States Complaint ¶ 61.  The Intervenors allege that PADEP issued

several operating permits for the emission sources at the Plant, the most recent of which is Title

V permit No. 32-00055, issued on January 2004, with an amendment effective on December 1,

2004.  PADEP/New York Complaint ¶ 23; New Jersey Complaint ¶ 22.  The actual Title V

permit was not attached to the Complaints or otherwise provided to the Court.  It is unclear

whether concerns regarding the projects at issue were raised during the ten year period when the

Title V permit application was under review by regulators.

     For many years, environmental regulators took no action to challenge the 1991, 1994,

1995 or 1996 projects as improper.  On June 12, 2008, the United States Environmental

Protection Agency ("EPA") issued a Notice and Finding of Violation ("NOV") to the Current

Owners.  On May 6, 2010 and November 1, 2010, the EPA issued subsequent NOVs to all of the

named Defendants.  Plaintiffs allege that Defendants undertook the 1991, 1994, 1995 and 1996

projects without having obtained the requisite PSD permits.  In addition, Plaintiffs allege that

because the projects should have triggered a requirement to install the Best Available Control

Technology ("BACT") to control emissions of sulfur dioxide ("$SO2$") and/or particulate matter,

Defendants failed to submit a complete application for a Title V operating permit, and thus failed

to obtain a proper or valid Title V operating permit.

     The United States initiated this action on January 6, 2011, with the filing of a four-count

civil complaint against all of the named Defendants.  Counts 1 and 3 allege violations by all

Defendants of the PSD provisions of the Clean Air Act, 42 U.S.C. §§ 7470-7492, and the

federally-approved Pennsylvania State Implementation Plan ("SIP"), for the projects at Units 1

and 2, respectively.  Counts 2 and 4 allege violations by all Defendants of the Title V provisions

of the Clean Air Act, 42 U.S.C. §§ 7661-7661(f), and the Pennsylvania Title V program, for the

subsequent operation of Units 1 and 2, respectively.  The United States seeks injunctive relief and the assessment of civil penalties since March 15, 2004.

On January 13, 2011, PADEP and New York intervened in the action and filed a five-count Complaint which provides more factual details, asserts similar violations of the PSD and Title V provisions of the federal Clean Air Act, asserts corresponding violations of the Pennsylvania Air Pollution Control Act ("APCA"), 35 P.S. § 4001, et seq., and its implementing regulations, and adds a common law public nuisance claim.   Additionally, New Jersey filed a separate three-count Intervenor Complaint which asserts essentially the same federal Clean Air Act claims set forth by the United States.  The Intervenors assert standing under the Clean Air Act citizen suit provision, 42 U.S.C. § 7604(a)(1), and seek injunctive relief and civil penalties relating back to the dates of the original projects.

## Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint.  The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff.  However, as the Supreme Court made clear in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007), the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*  The Supreme Court has subsequently broadened the scope of this requirement, stating that only a complaint that states a ***plausible*** claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (emphasis added).  A district court must conduct a two-part analysis when presented with a motion to dismiss for failure to state a claim.  First, the Court must separate the factual and legal elements of the claim.  *Fowler v. UPMC Shadyside*, 578 F.3d

203, 210 (3d Cir. 2009).  Although the Court "must accept all of the complaint's well-pleaded

facts as true, [it] may disregard any legal conclusions."  *Id*. at 210-211.  Second, the Court "must

then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff

has a 'plausible claim for relief.'  In other words, a complaint must do more than allege the

plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."

*Id*. at 211 (citing *Iqbal,* 129 S. Ct. at 1949).  The determination of "plausibility" will be "'a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.'"  *Id*. at 211 (quoting *Iqbal,* 129 S. Ct. at 1950).

## Legislative Overview

This case primarily involves statutory interpretation of the Clean Air Act.  In *Alston v.

Countrywide Financial Corp*., 585 F.3d 753 (3d Cir. 2009), the Court of Appeals for the Third

Circuit described the task as follows:

> The role of the courts in interpreting a statute is to give effect to Congress's
> intent.... Because it is presumed that Congress expresses its intent through the
> ordinary meaning of its language, every exercise of statutory interpretation begins
> with an examination of the plain language of the statute. When the statute's
> language is plain, the sole function of the courts-at least where the disposition
> required by the test is not absurd-is to enforce it according to its terms.

*Id*. at 759 (citations omitted).  Accordingly, the Court begins with an examination of the

applicable statutory framework.

In 1970, in response to dissatisfaction with existing air pollution programs, Congress

enacted amendments to the Clean Air Act which significantly increased the federal oversight

role.  The statute was intended "to guarantee the prompt attainment and maintenance of specified

air quality standards."  *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 469 (2004).

Plaintiffs contend that the decision in this case should uphold the fundamental purpose of the

Clean Air Act to reduce air pollution.  The statute required the EPA to promulgate national

ambient air quality standards (NAAQS) for pollutants, including SO2, which may reasonably

endanger public health or welfare.  42 U.S.C. §§ 7408, 7409.  Each state was required to submit

for EPA approval a State Implementation Plan (a "SIP") to implement, maintain and enforce

NAAQS.  42 U.S.C. § 7410.[4]  In addition, the EPA was required to develop "technology-based

performance standards" designed to limit emissions from major sources of pollution.  *Chevron,*

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 846 (1984); 42 U.S.C. §

7411(b).

 As with most legislation, the Clean Air Act amendments reflected a congressional

compromise.  As explained in *Chevron,* 467 U.S. at 847:  "the legislative struggle was basically

between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs

and interests advancing the economic concern that strict schemes would retard industrial

development with attendant social costs."  As one legislative compromise, the Clean Air Act has

less stringent regulations regarding existing power plants as compared to newly constructed

sources of electricity.  In other words, existing plants were "grandfathered" in recognition of the

expense of retrofitting pollution-control equipment.  *Compare* 42 U.S.C. §§ 7411(d) and (f).  As

explained in *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 909 (7th Cir. 1990):

> Consistent with its balanced approach, Congress chose not to subject existing
> plants to the requirements of NSPS and PSD. Members of the House recognized
> that "[b]uilding control technology into new plants at time of construction will
> plainly be less costly then [sic] requiring retrofit when pollution control ceilings
> are reached." H.R.Rep. No. 294, 95th Cong., 1st Sess. 185, reprinted in 1977
> U.S.Code Cong. & Admin.News at 1264. But Congress did not permanently
> exempt existing plants from these requirements; section 7411(a)(2) provides that

---

[4] SIP provisions must meet federal standards, are subject to review and approval by the EPA, and are federally
enforceable once approved.  States have broad discretion in designing their SIPs, but the plans must include certain
federal standards and are subject to EPA review and approval.  *See Alaska Dep't*, 540 U.S. at 470.  At all times
relevant to this case, Pennsylvania had an EPA-approved SIP.

existing plants that have been modified are subject to the Clean Air Act programs at issue here.

*Accord United States v. Cynergy Corp.*, 458 F.3d 705, 709 (6th Cir. 2006) (Clean Air Act treats old plants more leniently than new ones but there is an expectation that old plants will wear out and be replaced by new ones which are subject to more stringent pollution controls).   Utility companies are not entitled to evade the Clean Air Act requirements by keeping the grandfathered power plants in operation indefinitely. *Alabama Power Co. v. Costle,* 636 F.2d 323, 400 (D.C. Cir. 1979) ("The statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program.")  Accordingly, the PSD permit requirements apply to both newly-constructed facilities and those that have had a "major modification" that would result in a "significant net emissions increase."  *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 568-69 (2007); 42 U.S.C. § 7411(a)(2). This case involves projects at "grandfathered" units of the Homer City Plant which Plaintiffs allege should have triggered the more rigorous Clean Air Act emissions standards.

PSD Program

Congress amended the Clean Air Act again in 1977 to add the "Prevention of Significant Deterioration" (PSD) program, which was intended to ensure that air quality in areas which were already "clean" (i.e., in compliance with NAAQS) would not degrade.  *Alaska Dep't*, 540 U.S. at 470-71.  The statutory authority for the PSD program is in Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7479.  Initially, the PSD program applied only to construction of new sources of pollution.  However, in November 1977, Congress passed a technical amendment which made the PSD program applicable to projects of modifications to grandfathered plants.

Safe Drinking Water Amendments of 1977, Pub. L. No. 95-190, 91 Stat. 1393, 1402 (1977) ("The term ['construction'] when used in connection with any source or facility, includes the modification (as defined in [42 U.S.C. § 7411(a)(4)]) of any source or facility").  *See United States v. Duke Energy Corp.*, 411 F.3d 539, 548 (4th Cir. 2005), rev'd on other grounds, 549 U.S. 561 (2007); *Alabama Power*, 636 F.2d at 401 n. 49.  The implications of this "technical amendment" were not fully appreciated at the time.

In this case, Plaintiffs allege that Defendants violated 42 U.S.C. § 7475(a), which is entitled "Preconstruction Requirements" and provides as follows:

(a) Major emitting facilities **on which construction is commenced**

No major emitting facility on which construction is commenced after August 7, 1977, ***may be constructed*** in any area to which this part applies ***unless*--

(1) **a permit has been issued** for such proposed facility in accordance **with this part** ***setting forth emission limitations for such facility*** which conform to the requirements **of this part**;

(2) **the proposed permit has been subject to a review** in accordance with this section, the required analysis has been conducted in accordance with regulations promulgated by the Administrator, and a public hearing has been held with opportunity for interested persons including representatives of the Administrator to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;

(3) the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions **from construction or operation** of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this chapter;

(4) **the proposed facility is subject to the best available control technology** for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility;

(5) the provisions of subsection (d) of this section with respect to protection of class I areas have been complied with for such facility;

(6) there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;

(7) the person who owns or operates, or proposes to own or operate, a major emitting facility **for which a permit is required under this part** agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source; and

(8) in the case of a source which proposes to construct in a class III area, emissions from which would cause or contribute to exceeding the maximum allowable increments applicable in a class II area and where no standard under section 7411 of this title has been promulgated subsequent to August 7, 1977, for such source category, the Administrator has approved **the determination of best available technology as set forth in the permit**.

42 U.S.C. § 7475(a) (emphasis added).

According to the plain meaning of the language of the statute, § 7475(a) provides that "No major emitting facility . . . may be constructed" unless each of the statutory conditions are met.   One of the preconditions to construction is the installation of Best Available Control Technology ("BACT").  § (a)(4).  BACT is not a particular type of technology.  Rather, it is defined in the Act as an "emission limitation based on the maximum degree of reduction of each pollutant subject to regulation ... which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable" for the facility in question.  42 U.S.C. § 7479(3).  As provided in §§ 7475(a)(1) and (a)(8), the Clean Air Act determination of emissions limitations and BACT for the facility are to be "set forth" in the PSD permit.

The PSD requirements are forward-looking and framed in terms of that which utilities must do before commencing construction.  Accordingly, an operator's duty is "not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will

cause." *Cynergy*, 458 F.3d at 709; *United States v. Ohio Edison Co.*, 276 F. Supp.2d 829, 863 (S.D. Ohio 2003) (operator must perform pre-construction estimate of whether change will result in significant net emissions increase).   Thus, in this case the Former Owners were required to have made a reasonable estimate, in advance, of whether the 1991, 1994, 1995 and 1996 projects constituted major modifications which would result in a significant increase of SO2 emissions. The regulations provide guidance but there are no clear, bright-line rules.   In *Cynergy*, 458 F.3d at 709, the Court recognized that "it may be a very difficult estimate to make."   In *United States v. Ohio Edison Co*., 276 F. Supp.2d 829, 832 (S.D. Ohio 2003), the Court lamented "an abysmal breakdown in the administrative process" in which various administrations have failed to address the  fundamental issue of "at what point plants built before 1970 must comply with new air pollution standards."

Title V Program

The Clean Air Act was again amended in 1990 (thirteen years after the PSD program was enacted) to provide the Title V statutory regime which governs the consideration and issuance of operating permits at power plants.   The Complaints allege that Defendants violated 42 U.S.C. §§ 7661a(a), 7661b(c) and 7661c(a).   Those statutory sections provide in relevant part as follows:

§ 7661a(a) Violations

After the effective date of any permit program approved or promulgated **under this subchapter**, it shall be unlawful for any person **to violate any requirement of a permit** issued **under this subchapter**, **or to operate** an affected source (as provided in subchapter IV-A of this chapter), a major source, any other source (including an area source) subject to standards or regulations under section 7411 or 7412 of this title, any other source **required to have a permit under parts C** or D **of subchapter I** of this chapter, or any other stationary source in a category designated (in whole or in part) by regulations promulgated by the Administrator (after notice and public comment) which shall include a finding setting forth the basis for such designation, **except in**

11

**compliance with a permit** issued by a permitting authority **under this subchapter**. (***Nothing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification.***)

§ 7661b(c) Deadline

Any person required to have a permit shall, not later than 12 months after the date on which the source becomes subject to a permit program approved or promulgated **under this subchapter**, or such earlier date as the permitting authority may establish, **submit** to the permitting authority **a compliance plan and an application for a permit** signed by a responsible official, who shall certify the accuracy of the information submitted. The permitting authority shall approve or disapprove a completed application (consistent with the procedures established under this subchapter for consideration of such applications), and shall **issue or deny the permit** . . .

§ 7661c(a) Conditions

Each permit issued under this subchapter **shall include enforceable emission limitations and standards**, a schedule of compliance, a requirement that the permittee submit to the permitting authority, no less often than every 6 months, the results of any required monitoring, and **such other conditions as are necessary to assure compliance with applicable requirements of this chapter**, including the requirements of the *applicable implementation plan*.[5]

(Emphasis added).

To summarize these sections, power plant operators must submit a compliance plan and a Title V permit application to regulators, who shall after review issue or deny the Title V operating permit. § 7661b. Each Title V permit is required to include all emission limitations and standards, and "such other conditions" necessary to assure a plant's compliance with the Clean Air Act. § 7661c. It is unlawful to violate a condition of a Title V permit or to operate a plant other than in compliance with a Title V permit. § 7661a. Title V recognizes that sources may be required to obtain a permit under the PSD program (part C of subchapter I) but specifically limits a source's compliance obligation to permits issued "under this subchapter," i.e., Title V permits.

---

[5] The United States Brief at 28 misquoted the statutory text by replacing the italicized phrase "applicable implementation plan" with the phrase "applicable PSD requirements."

§ 7661a.  Title V does not alter the requirements of the PSD program to obtain a preconstruction

permit.  § 7661a.

Structurally, it is clear that PSD and Title V are two separate programs, enacted at

different times, and specified in different subchapters of the Clean Air Act.[6]   As explained in

*United States v. Marine Shale Processors*, 81 F.3d 1329, 1356 (5th Cir. 1996):

> The Clean Air Act statutory scheme contemplates at least two different types of
> air permits unhappily named "preconstruction permits" and "operating permits,"
> with confusion easily resulting from the fact that preconstruction permits often
> include limits upon a source's operations. Preconstruction permits result from a
> review process that occurs before construction of or major modification to a
> stationary source. At this stage, the permitting authority must determine whether
> the proposed construction or modification would violate a state's emissions
> control strategy or interfere with the attainment or maintenance of Clean Air Act
> air quality standards. 40 C.F.R. § 51.160(a)(1-2). In contrast, operating permits
> focus on a source's current emissions, even if the source has not recently
> undergone construction or major modification. *See* 40 C.F.R. § 70.1(b) ("All
> sources subject to these regulations shall have a permit to operate...."). The
> distinction between preconstruction and operating permits is critical.

*See also United States v. Illinois Power Co.*, 245 F. Supp.2d 951, 955 (S.D. Ill. 2003) (noting the

distinction between violations of preconstruction permit requirements and operating permit

requirements).

Title V permits do not generally impose any new emission limits, but are intended to

incorporate into a single document all of the Clean Air Act requirements applicable to a

particular facility.  *See Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738,

742 (9th Cir. 2008).  Similar to other Clean Air Act programs, Title V is implemented primarily

by the states under EPA oversight.  *See id.*  In states with EPA-approved programs, Title V

---

[6] Plaintiffs argue in response to NYSEG's supplemental authority that the Cross-State Air Pollution Rule is separate
and distinct from the PSD program because they are authorized under different provisions of the Clean Air Act (42
U.S.C. § 7410(a)(2)(D) versus 42 U.S.C. § 7410(a)(2)(C)).  Document No. 109 at 3 n.1.  This argument highlights
the separateness of the PSD and Title V programs – which are based not on adjacent sub-sub-subsections of the
same provision, but in different subchapters of the statute.

permits are issued by the state permitting authority, subject to EPA review and veto.  *See id.* at 742-43; 42 U.S.C. § 7661d.

## Legal Analysis

A.  PSD Claims

Plaintiffs allege that the Former Owners violated the PSD program by having undertaken construction projects without having obtained the necessary PSD preconstruction permits. Plaintiffs also allege that the Current Owners violated the PSD program by failing to implement BACT at units that had been improperly modified because the PSD program imposes ongoing obligations at modified facilities.

The PSD program is rather straight-forward when applied to construction of new plants but is difficult to enforce when applied to operating, grandfathered facilities.  Because grandfathered facilities are subject to less stringent rules regarding emissions, power plant operators have an obvious incentive to attempt to keep them in operation as long as possible to avoid the cost of installing more advanced pollution controls.  *See Cynergy*, 458 F.3d at 709.  In addition, there are often no clear-cut rules for specifically determining which projects will trigger the PSD requirements.  *Id.*  Again, power plant operators have an obvious incentive to make a "reasonable" prediction that the stricter emissions standards will not be implicated. Nevertheless, the PSD regulations are only triggered if and when the power plant operator (the person with an incentive to avoid the program) voluntarily "self-reports" by applying for a preconstruction permit.  There is no mechanism – other than post-hoc litigation – by which environmental regulators are empowered to trigger the PSD and BACT requirements.  In other words, the PSD program is somewhat reliant on the proverbial fox to guard the henhouse.

If the operator determines (rightly or wrongly) that a pre-construction PSD permit is not necessary for a particular modification of the plant, no specific action is required on anyone's part -- the operator simply continues to run the plant as usual.  The statutory and regulatory mechanisms for implementing pollution controls are not triggered.  No pre-construction permit is issued by which operating conditions may be established or later incorporated into a Title V permit.  The process to determine BACT case-by-case at the facility does not occur.  As explained in *United States v. Midwest Generation, LLC*, 694 F. Supp.2d 999, 1007 (N.D. Ill. 2010):

> The provision regarding "best available control technology" does not stand alone, but appears within the context of "preconstruction requirements." It is determined on a case-by-case basis through the permitting process itself. Tellingly, the Plaintiffs' brief states that "[i]f a PSD permit had been issued for each of the alleged modifications, each permit would have set forth [best available control technology] requirements." (Pl. Opp'n Br. 4.) This underscores the fact that the ongoing requirements cited by Plaintiffs are tied to the application of the permit and that it is the original failure to obtain that permit which violates these PSD provisions. There is no obligation to apply "best available control technology" in the abstract.

This same structural difficulty within the PSD program was also noted in *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1016 (8th Cir. 2010):

> Where, as here, the operator never applied for any PSD permits, there is no application and no approval with which it can comply. Thus, while Otter Tail may have violated § 52.21(r)(1) by failing to apply for PSD permits in the first place, it does not continue to do so by failing to comply with a hypothetical set of operational parameters that would have been developed through the permitting process.

*Accord National Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority (Nat'l Parks 11th Cir.)*, 502 F.3d 1316, 1325 (11th Cir. 2007) (BACT is to be determined through the preconstruction permitting process).

These structural aspects of the PSD program (vague triggering standards and reliance on the operator to voluntarily apply for a permit and enter the program) are amplified when a grandfathered facility changes ownership.  In this case, the Former Owners apparently decided in 1991, 1994, 1995 and 1996 that permits under the PSD program were not needed for the projects at issue.  Accordingly, PSD permits were not applied for or obtained and the Plant continued with its normal operations.  In each instance, the five-year statute of limitations for recovering a civil penalty for a PSD violation expired without any challenge from federal or state regulators.  The Former Owners did apply for a Title V permit, which was under consideration by the reviewing agency for almost ten years.  A Title V permit was eventually issued in January 2004.  When the Current Owners purchased the Plant, there was no pending alleged violation of the PSD program that the purchasers could have discovered during their due diligence. [7]   It was not until 2008 and 2010 that NOV's were issued to retrospectively challenge the 1991, 1994, 1995 and 1996 decisions to not obtain PSD permits.  Thus, it is difficult to understand how the Current Owners could have avoided PSD liability under Plaintiffs' theory of the case.   The Current Owners did not own or operate the Plant at the time the projects at issue were undertaken and there was no indication that the Former Owners had committed a PSD violation.  In essence, Plaintiffs' theory would require the Current Owners to have filed an application for a prophylactic PSD permit immediately upon acquisition of the Plant, just in case any work done by the Former Owners was later determined to have triggered the PSD program requirements.

Understandable frustration with apparent efforts to evade the PSD program has led some courts to construe § 7475(a) more broadly than others.  In *United States v. Am. Elec. Power Serv.*

---

[7] At this stage of the case, the Court assumes that the 1991, 1994, 1995 and 1996 Projects should have triggered the PSD permitting requirements.  However, to succeed in their claims, it is Plaintiffs' burden to prove that each of Defendants' projects constituted a major modification that would have significantly increased SO2 emissions. *United States v. Eastern Kentucky Power Co.*, 498 F. Supp.2d 995 (E.D. Ky. 2007); *Sierra Club v. Morgan*, 2007 WL 3287850 *12 (W.D. Wis. 2007).

*Corp.,* 137 F. Supp.2d 1060, 1066 (S.D. Ohio 2001), the Court commented that "it is illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the permit requirements." In *New Jersey v. Reliant Energy MidAtlantic Power Holdings, LLC,* 2009 WL 3234438 (E.D. Pa. 2009), the Court extended this reasoning to suggest that an operator may be held liable "simply because its predecessor owner failed to secure the appropriate permit."  *See also New York v. Niagara Mohawk Power Corp.*, 263 F.Supp.2d 650, 663 (W.D.N.Y. 2003) (allowing operator to use its own failure to obtain preconstruction permit as a shield "would lead to absurd and surely unintended results").  This contention might be persuasive if the failure to obtain a PSD permit was "cut and dry" and indisputable (as it may be when applied to new construction).  However, in the factual scenarios described in many of the reported cases which involve grandfathered facilities, such is seldom the case.  To the contrary, the power plant operators often vigorously contest their alleged PSD liability and assert that they were ***not*** required to obtain a PSD permit because, *inter alia*, the projects constituted "routine maintenance, repair and replacement" or were forecasted to not result in significant increases in emissions.   It is often unclear, even in retrospect, whether the operators or the government regulators are correct.  *See Cynergy*, 458 F.3d at 709.  For example, in this case the Intervenors – but not the United States – contend that the 1995 and 1996 reheater projects triggered the PSD program requirements.

Thus, there is, indeed, a principled and logical basis for distinguishing between the original decision to not obtain a permit and subsequent operations.  If the operator wrongly failed to obtain a PSD pre-construction permit, it is that decision -- rather than post-project operations based on the assumption that no permit was needed -- that is sensibly subject to post-hoc, retrospective challenge.  In other words, at least in the context of grandfathered, operating

facilities that have changed ownership, it is reasonable to construe § 7475(a) in accordance with its plain text as being directed to the initial decision of whether or not to obtain a preconstruction PSD permit.

With this background, the Court turns to the specific claims in this litigation.


### 1.   Civil Penalties

The United States seeks civil penalties commencing on March 15, 2004, based upon the default five-year federal limitations period set forth in 28 U.S.C. § 2462.  The Intervenor Complaints seek civil penalties commencing from the time of the projects in the early 1990s. However, the Intervenors have since abandoned their claim for civil penalties and have explained that they now seek only injunctive relief.  Intervenors' Brief at 37 n. 15.

The United States seeks civil penalties only from the Current Owners.  The government contends that the Current Owners violated an independent, continuing obligation under § 7574(a)(4) to bring the Plant into compliance with BACT and operated the Plant after the projects contrary to the PA SIP, citing *Sierra Club v. Dairyland Power Coop.*, 2010 WL 4294622 * 12 (W.D. Wisc. 2010).  The Current Owners contend that they did not violate the PSD program and that any claims for civil penalties are time-barred.

A PSD violation occurs, at the latest, at the time of the construction project.  *Midwest Generation*, 694 F.Supp.2d at 1009 ("PSD violation occurs at the time the alleged construction or modification begins").  The applicable statutory provision, 42 U.S.C. § 7475, is entitled "Preconstruction Requirements" and states that no major emitting facility "may be constructed" unless it satisfies the listed prerequisites.  The majority rule is that a failure to obtain a PSD

permit is a one-time violation and is not a continuing violation.  As persuasively explained in

*New York v. Niagara Mohawk*, 263 F.Supp.2d at 661:

> A given construction or modification project occurs only once. If a permit is not
> obtained for that particular project, then the preconstruction permit requirement of
> the Clean Air Act has been violated. However, the requirement to secure a
> preconstruction permit applies prior to construction or modification. Once the
> construction or modification is complete, the window in which to apply for and
> obtain a preconstruction permit is gone. Thus, a violation of the Clean Air Act's
> preconstruction permit requirement is singular in nature, and does not constitute
> an ongoing violation.

*See also Sierra Club v. Portland Gen. Elec. Co.*, 663 F.Supp.2d 983, 991-92 (D. Or. 2009)

(recognizing majority rule and collecting cases); *United States v. Illinois Power Co.*, 245

F.Supp.2d 951, 957 (S.D. Ill. 2003) ("a violation of the Clean Air Act's preconstruction permit

requirements ... occurs at the time of the construction or modification and is not continuing in

nature");  *United States v. Southern Ind. Gas & Elec. Co.*, 2002 WL 1760752, *4 (S.D. Ind.

2002) ("failure to obtain a preconstruction permit is a discrete violation that occurs at the time of

construction"); *United States v. Westvaco*, 144 F.Supp.2d 439, 443 (D. Md. 2001)

("preconstruction permit violations occur only at the time of the construction or modification of

the emitting facility"); *United States v. Murphy Oil USA, Inc.*, 143 F.Supp.2d 1054, 1083-84

(W.D. Wis. 2001) ("the statute of limitations for a violation of the preconstruction permit

requirements ... begins to run at the time of construction and does not continue through the

operational life of the modified source"); *United States v. Brotech Corp.*, 2000 WL 1368023 *3

(E.D. Pa. 2000) ("[v]iolations of the various requirements to obtain construction permits or plan

approvals occur at the time of the construction, modification, or installation of the equipment or

facility"); *United States v. Campbell Soup Co.*, 1997 WL 258894, *2 (E.D. Cal. 1997) ("the

regulation cannot reasonably be construed to mean that building or altering a machine without a

permit is a violation that continues as long as the machine still exists or is operated").  Two

courts of appeals have concluded that failure to obtain a PSD permit is a one-time, non-

continuing violation.  *See National Parks 11th Cir.*, 502 F.3d at 1322; *Otter Tail*, 615 F.3d at

1017; *but see National Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority ("Nat'l*

*Parks 6th Cir.")*, 480 F.3d 410, 419 (6th Cir. 2007) (concluding that PSD violation was ongoing

based on language in Tennessee SIP).  In sum, the alleged PSD violations occurred, if at all,

when the Former Owners failed to apply for a preconstruction PSD permit in 1991, 1994, 1995

and 1996.  Because the Current Owners were not involved in this conduct, they cannot be held

liable under the PSD provisions of the Clean Air Act.

　　　　*Dairyland Power,* 2010 WL 4294622, represents a distinct minority view and did not

involve a change in ownership, as occurred in this case.  In essence, the *Dairyland Power* Court

noted the several references to "operations" in § 7475(a) and concluded that:  "although the

obligations to apply best available control technology, conduct monitoring and make air quality

demonstrations may be determined during the permitting process and included in a PSD permit,

they are obligations independent of the permit requirement" such that Plaintiffs could bring a

separate claim for the alleged failure to implement BACT.  *Id*. at *5.[8]  This Court respectfully

cannot agree.  Of course, if a scrubber was determined to be BACT and thus required to be

installed at the Plant as a condition of obtaining a PSD permit, that scrubber would obviously be

intended to remain in place for future operations.  *See* 42 U.S.C. 7410(j) (As a condition for

issuance of any permit required under this subchapter (i.e., a PSD permit), the operator must

show that the "construction or modification and operation of such source will be in compliance

with all other requirements of this chapter.")  However, in this case, the Former Owners never

obtained a PSD permit and no such condition was ever established.  Under the plain text of §

---

[8] The *Dairyland Power* Court interpreted the Wisconsin SIP to make the PSD requirements applicable post-construction, *id*. at * 14, and was concerned that the owner not be rewarded for its failure to obtain a PSD permit. *Id*. at *15.

7475(a), the references to operations occur only within the conditions listed in subsections (1) – (8), after the "unless" clause.  The only actual, actionable prohibition in § 7475(a) is that "No major emitting facility . . . may be constructed."  In short, BACT is a prerequisite condition to obtaining a PSD permit -- not an independent, freestanding obligation.  Congress could have provided that it is an independent PSD violation to operate a plant without BACT, but it did not do so.  *See Sierra Club v. Duke Energy Indiana, Inc.*, 2010 WL 3667002 * 7 (S.D. Ind. 2010).

In summary, the Court concludes that the alleged PSD violations constitute singular, separate failures by the Former Owners to obtain pre-construction permits, rather than ongoing failures to comply with whatever hypothetical conditions might have been imposed during the PSD permitting process.[9]  Thus, the United States was required to file suit to recover civil penalties for an alleged PSD program violation within five years of the construction project, as provided in the default federal statute of limitations, 28 U.S.C. § 2462.[10]  Because the projects at issue in this case occurred 15-20 years ago and no enforcement action was taken until 2008, the limitations period has long since expired.  Accordingly, no civil penalties are recoverable for the alleged PSD violations.

2.     Injunctive Relief

Plaintiffs contend that even if they are unable to recover civil penalties for the alleged PSD program violations, they are entitled to obtain injunctive relief against all Defendants. Specifically, Plaintiffs ask the Court to enjoin the Current Owners from operating the Plant

---

[9] The United States' brief at p. 10 misleadingly quoted § 7413(b).  The actual text of § 7613(b) states, in relevant part, that the Administrator may commence a civil action "(1) Whenever such person has violated, or is in violation of, any requirement or prohibition of ***an applicable implementation plan or permit*.**"  The United States replaced the highlighted text with a generic reference to "[the Act.]"  Contrary to the United States' suggestion, the Administrator is not empowered by this section to litigate a free-standing violation of "the Act," but instead, must point to a violation "of an applicable implementation plan or permit."  The fundamental problem in this case is that the Former Owners never obtained a PSD permit that would have imposed the applicable requirements.

[10] Plaintiffs have not attempted to plead a basis for equitable tolling of the limitations period.

except in accordance with the PSD permit regulations and to order all Defendants to remedy past violations by cooperating to install BACT at the Plant.  Plaintiffs emphasize the breadth and flexibility of the court's equitable powers and contend that the relief sought is not impossible to implement.

The Current Owners contend that they cannot be held liable for injunctive relief because they did not violate the PSD program. The Court agrees.  As explained above, the statutory prohibition in the PSD program, § 7475(a), is having commenced construction or modification without a permit.  This alleged violation involved the Former Owners exclusively.  As the Court explained in *Niagara Mohawk*, 263 F.Supp.2d at 668-69:

> By its plain terms, 42 U.S.C. § 7475(a) does not impose liability on any person other than the one who fails to comply with its requirements. Preconstruction obligations are imposed only upon the person who actually seeks to construct or modify a facility within the meaning of the Act. . . .  Here, there is no dispute that the NRG Defendants neither owned nor operated the Facilities at the time the modifications allegedly occurred. (Amended Complaint, ¶ 13.) The NRG Defendants are after-the-fact, third-party purchasers. Hence, the NRG Defendants had neither the obligation nor the ability to comply with the mandates of 42 U.S.C. § 7475(a). Even assuming the truth of the allegations contained in the Amended Complaint, that is, that the Facilities were modified without fulfillment of the preconstruction requirements, 42 U.S.C. § 7475(a) does not give rise to a cause of action against the NRG Defendants.

The same analysis applies to the Current Owners in this case.  They could not possibly have applied for a PSD pre-construction permit for the 1991, 1994, 1995 or 1996 modification projects because they had no connection to the Plant or the Former Owners at that time.  It is axiomatic that in order to obtain injunctive relief, a Plaintiff must first establish a successful claim on the merits.  *See, e.g., Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 850 (3d Cir. 1984) (before issuing permanent injunction, "the court must determine if the plaintiff has actually succeeded on the merits").  Plaintiffs cannot succeed on a PSD claim

against the Current Owners, as a matter of law.  Accordingly, the PSD claims against the Current

Owners, including the request for injunctive relief, will be dismissed with prejudice.

 The more difficult question is whether this Court may award injunctive relief under the

PSD program against the Former Owners.  It is certainly clear from the statutory text of 28

U.S.C. § 2462 that the five-year limitations period applicable to civil penalties does not place a

time limit on Plaintiffs' ability to obtain injunctive relief.  The Court recognizes that SO2

emissions have been ongoing, and likely would have been dramatically reduced had the Former

Owners applied for a PSD permit.  The Former Owners contend that the Court lacks the

authority to award injunctive relief for numerous reasons: (1) § 7413(b) authorizes only forward-

looking relief, as opposed to remedies of past violations; (2) the lack of precedential authority;

(3) requiring the Former Owners to pay money for installation of a scrubber would constitute a

remedy at law, penalty or forfeiture, *see Reliant Energy*, 2009 WL 3234438 at * 17 (rejecting

analogous effort to require a former owner to pay for the installation of BACT to remedy the

alleged failure to obtain a PSD permit); (4) the requested injunction is impossible to implement

because they no longer possess the Plant, *see Midwest Generation*, 2011 WL 1003916

(dismissing PSD claims for injunctive relief against former owner); and (5) the concurrent

remedy doctrine.  The Former Owners also contend that Plaintiffs have failed to demonstrate an

entitlement to injunctive relief, that an emergency exists, the lack of alternative remedies,[11] or

that regulators acted diligently to enforce the PSD provisions, *see United States v. Cinergy

Corp.*, 582 F. Supp.2d 1055, 1066 (S.D. Ind. 2008) ("a significant delay between a violation and

---

[11] Defendants suggest that the regulators could have: (1) challenged the failure to get a PSD permit within five years of the projects; and (2) challenged issuance of the Title V permit; and may now (3) revise the SIP, 42 U.S.C. § 7410(k); (4) file a petition regarding upwind/downwind states, 42 U.S.C. § 7426; (5) assert emergency authority, 42 U.S.C. § 7603; and  (6) address the alleged harms via the recently promulgated Cross State Air Pollution Rule.  The Court expresses no opinion as to the viability of any of these options.

the USA's filing suit may be relevant in determining whether to grant injunctive or other equitable relief at all").

The Court is reluctant to conclude, as a broad principle, that it lacks authority to award injunctive relief under the PSD program, *see id*., and it need not do so to resolve this case. Plaintiffs must demonstrate not only that injunctive relief is within the Court's power in theory, but also that there is a plausible basis for granting such relief in this case.  As explained by the United States Supreme Court, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313 (1982); *Accord Natural Resources Defense Council v. Texaco Refining and Mkt., Inc*., 906 F.2d 934 (3d Cir. 1990).  For example, in *United States v. Price*, 688 F.2d 204 (3d Cir. 1982) (involving emergency powers under the Safe Drinking Water Act), which was cited by both sides, the Court of Appeals noted the broad and flexible equitable powers available to the courts, but nevertheless affirmed the district court's denial of injunctive relief that would have required current and former owners of a waste site to fund a public health study.

In this case, the facts alleged in the Complaints fall far short of those necessary to render a claim for injunctive relief plausible.  Injunctive relief is a rare and extraordinary remedy which should be granted in only limited circumstances.  *See, e.g., Frank's GMC*, 847 F.2d at 102.  The relief sought in this case against former owners is even more novel, and was rejected at the Rule 12(b)(6) stage in the *Midwest Generation* and *Reliant Energy* cases.

In particular, the purpose of an injunction is to prevent future violations. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953). As a result, before an injunction may properly issue,

the court must find that there exists some cognizable danger of recurrent violation. The moving

party bears the burden of satisfying the court that such danger exists and that injunctive relief is

necessary. *Id.* As the Court of Appeals for the Third Circuit recently explained:

> While "the court's power to grant injunctive relief survives discontinuance of the
> illegal conduct, the purpose of an injunction is to prevent future violations."
> *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303
> (1953). Where the illegal conduct has ceased, the party seeking the injunction
> bears the burden of proving "that there exists some cognizable danger of recurrent
> violation, something more than the mere possibility which serves to keep the case
> alive." *Id.*

*Primepoint, L.L.C. v. PrimePay, Inc*., 401 Fed. Appx. 663, 664 (3d Cir. 2010) (unpublished);

*accord United States v. SCM Corp.,* 667 F.Supp. 1110, 1128 (D. Md. 1987) (denying request for

injunctive relief under Clean Air Act because there was no danger of recurrent violations).  For

the reasons set forth above, the Court has determined that the Former Owners' alleged PSD

violations constituted wholly-past failures to obtain pre-construction permits that did not

constitute continuing violations.

Plaintiffs also contend that the Court should award injunctive relief to remedy the

continuing harm caused by excess pollution, even if there was a one-time violation, citing

*Cynergy*, 582 F.Supp.2d at 1055.  The Court is not persuaded that Plaintiff has pleaded a

plausible basis for similar relief in this case.  In *Cynergy*, the power plant operator had been

found in violation of the Clean Air Act by a jury and was seeking to limit post-trial discovery

into the remedy.  The court concluded that it had authority to "order a full and complete remedy

for harms caused by a past violation" but noted that it was premature to make any such ruling.

*Id*. at 1066.  There had been no change in ownership, so the *Cynergy* court did not have to

grapple with that complication.  Moreover, the court's reference to continuing *harm* appears to

be inconsistent with the Supreme Court's requirement of a continuing *violation*.  In *Steel Co. v.*

*Citizens for a Better Environment,* 523 U.S. 83, 109 (1998), the Court held: "Because

respondent alleges only past infractions of EPCRA, and not a continuing *violation* or the

likelihood of a future *violation*, injunctive relief will not redress its injury." Id. at 109 (emphasis

added).  Similarly, in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S.

49, 66 (1987), the Court explained that defendants are protected from Clean Water Act[12] suits

"based solely on *violations* wholly unconnected to any present or future *wrongdoing*."  *Id.* at 66-

67 (citing *W.T. Grant*) (emphasis added);  *Accord Askew v. Trustees of the General Assembly of*

*the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 776 F.Supp.2d 25 (E.D. Pa. Mar

11, 2011) ("when seeking injunctive relief the plaintiff's burden is not satisfied by proving the

occurrence of prior illegal acts, but must include proof of continuing violations") (citations

omitted).  In *Nat'l Parks 11th Cir.*, 502 F.3d at 1322, the Eleventh Circuit Court of Appeals

persuasively characterized continued emissions due to the alleged failure to obtain a PSD permit

as "present consequences of a one-time violation."  Thus, even if injunctive relief to remedy past

harms is within the Court's authority, such relief is not warranted for the PSD violation alleged

in this case – a failure to obtain a preconstruction permit, followed by continued normal

operations of a grandfathered facility.

Plaintiffs have failed to plead any facts to explain the nearly two decade delay in

enforcement.  Plaintiffs' theory of harm is undercut by the lengthy review and ultimate issuance

of a Title V operating permit for the Plant, which is required to contain the "conditions as are

necessary to assure compliance" with the Clean Air Act.  42 U.S.C. § 7661c(a).  Any future

"modification" project undertaken by the Current Owners will trigger a new statute of limitations

and a new opportunity for the Plaintiffs to challenge it.  Most notably, there is no risk of a PSD

---

[12] In *Gwaltney*, the plaintiffs alleged an ongoing violation of a permit.  In this case, by contrast, because no PSD permit was obtained, there can be no ongoing violation.

violation in the future because the Former Owners no longer own or operate the Plant.

Accordingly, an injunction against the Former Owners is not warranted.  The Court need not

resolve the parties' remaining contentions regarding injunctive relief.  In summary, the PSD

claims will be dismissed in their entirety.


    B.  Title V Claims

The Intervenors do not assert Title V claims against the Former Owners.  Intervenors'

Brief at 23 n.7.  It is unclear whether the United States continues to assert Title V claims against

all Defendants.  In any event, the Title V claims against the Former Owners are clearly without

merit for the simple reason that they never owned or operated the Plant during the relevant time

period.   The Former Owners sold the Plant in 1999 and the Title V operating permit was not

issued until 2004.  United States' Complaint ¶¶ 61-62.  Accordingly, the Title V claims against

the Former Owners will be dismissed with prejudice.

The Title V claims against the Current Owners require more in-depth analysis.  Unlike a

PSD violation, a Title V operating permit violation would not be a discrete, one-time event.  As

explained in *United States v. Westvaco,* 144 F.Supp.2d at 443-44:

> [There is] a significant distinction between a failure to obtain preconstruction
> permits and plan approvals and failure to obtain *operating* permits. The latter
> violation would be continuing since every day of operation without an operating
> permit is another violation. In contrast, a violation for failure to obtain a
> construction permit does not continue once the unpermitted construction is
> completed.

Accordingly, the Title V claims are not time-barred.

The gravamen of Plaintiffs' theory is that "Defendants are illegally operating without a

Title V operating permit that imposes BACT limits on modified units."  United States Brief at

28.  Plaintiffs argue that by failing to acknowledge that the 1991, 1994, 1995 and 1996 projects

triggered the PSD regulations, the Former Owners allegedly filed an incomplete Title V permit

application, which "led to the issuance of a deficient Title V permit that lacked necessary

pollution controls for the modified units."  United States Brief at 30.  In other words, Plaintiffs

argue: (1) that Title V incorporates the PSD and BACT requirements; and (2) that Defendants do

not have a valid Title V permit.  Neither argument is persuasive.

The "incorporation" argument is contrary to the statutory text.  42 U.S.C. § 7661a(a)

provides that it is unlawful "to violate any requirement of a permit issued under **this subchapter**,

or to operate [a plant] except in compliance with a permit issued by a permitting authority under

**this subchapter**."  (Emphasis added).  On its face, Title V does not incorporate compliance with

the PSD program as a condition of a Title V permit.[13]  To the contrary, although § 7661a

recognizes that sources may be required to obtain PSD permits, the prohibited conduct is

specifically limited to violations of permits issued under "this subchapter," i.e., Title V permits.

It would have been simple for Congress to have provided that a PSD permit violation also

constituted a violation of a plant's Title V operating permit, but no such language exists.

Instead, the parenthetical in § 7661a(a) specifically cautions that nothing in Title V be construed

to alter the applicable PSD requirements regarding preconstruction permits.  Thus, the statutory

text reflects that Congress intended the requirements of the Title V and PSD programs to be and

remain separate and distinct.

Plaintiffs' contention that the Current Owners lack a valid Title V permit is equally

unfounded.  As an initial matter, the Complaints filed by all Plaintiffs expressly acknowledge

that a Title V permit was, in fact, issued for the Plant.  As pled, PADEP issued several operating

permits for the emission sources at the Plant, the most recent of which is Title V permit No. 32-

---

[13] The PSD program provisions could not have incorporated Title V requirements because that subchapter of the statute was not enacted until 13 years later.

00055, issued in January 2004, with an amendment effective on December 1, 2004.

PADEP/New York Complaint ¶ 23; New Jersey Complaint ¶ 22.  Thus, any suggestion that

Defendants did not have a Title V operating permit is flatly wrong.[14]  Moreover, Plaintiffs have

not alleged any affirmative condition in the Title V permit which is being violated.  *See Reliant*

*Energy*, 2009 WL 3234438 (rejecting Title V claims for failure to allege a violation of a

provision in the permit).  Instead, they allege that a relevant condition, BACT, has been omitted

from the permit.

Plaintiffs' more nuanced argument is that the Title V permit for the Plant is null and void

because it was based on a flawed application.  According to Plaintiffs, the Former Owners failed

to disclose that they should have obtained PSD permits for the 1991, 1994, 1995 and 1996

projects, which would have resulted in installation of BACT.    But this argument, too, is

unpersuasive.  Because the Former Owners had not applied for a PSD permit, the BACT

standards which may have been triggered during the PSD approval process were not determined

or implemented.  The Former Owners did not apply for a PSD Permit and the process by which

operating requirements such as BACT would have been established was never triggered.   Put

another way, there is no way that the Current Owners could have known that the Title V

application submitted by the Former Owners was flawed, because no PSD violation was ever

established.  A facially valid Title V permit was duly issued by PADEP which "incorporate[d]

into a single document all of the Clean Air Act requirements governing a facility."  *Romoland*

*Sch. Dist.,* 548 F.3d at 742.  The Current Owners were entitled to rely on the facial validity of the

Title V permit.  *See Otter Tail*, 615 F.3d at 1022 ("to allow plaintiffs to raise issues resolved

during the permitting process long after that process is complete would upset the reasonable

---

[14] Similarly, Section 7661b(c) requires power plant operators to apply for a Title V permit, and the Complaints aver
that the Former Owners filed such an application in 1995.

expectations of facility operators and undermine the significant investment of regulatory

resources made by state permitting agencies.")  In *United States v. AM General Corp.*, 34 F.3d

472, 475 (7th Cir. 1994), the Court disallowed a similar collateral attack on a facially valid state

permit based on a prior modification and reasoned:

> We cannot find in the text of the Clean Air Act, or elsewhere, any indication that
> Congress expressly or by implication meant to authorize the EPA to mount a
> collateral attack on a permit by bringing a civil penalty action as many as five
> years after the permit had been granted and the modification implemented, 28
> U.S.C. § 2462, by which time a defendant would have accrued a potential liability
> in excess of $40 million, even though it had been operating under a permit valid
> on its face and never before challenged. That would be a harsh remedy and we
> cannot be confident in the absence of any clues that it was one intended to be
> useable in the circumstances of this case.

Similar Title V claims were rejected in *Otter Tail* and *Midwest Generation*.  In *Midwest*

*Generation*, 2011 WL 1003916 at *12, the court explained:

> BACT limits are imposed through the preconstruction-permit process. In the
> absence of such a permit, they do not exist. There "is no obligation to apply
> [BACT] in the abstract"; it "is a specific prerequisite to obtaining a
> preconstruction permit" that is "determined on a case-by-case basis through the
> [PSD] permitting process itself." *Midwest Generation,* 694 F.Supp.2d at 1007.

*Accord Otter Tail*, 615 F.3d at 1017 (BACT limits may be incorporated into a facility's

construction plans and PSD permits, but do not establish an ongoing duty to apply BACT

independent of the PSD permitting process).  This Court agrees with the reasoning in those

cases.[15]

Moreover, this Court harbors substantial subject-matter jurisdiction concerns as to its

authority to decide Plaintiffs' challenge to the permit application, because the Clean Air Act

---

[15] In *Commonwealth of Pennsylvania v. Allegheny Energy, Inc*. 2006 WL 1520650 (W.D. Pa. 2006), this Court
adopted a Report and Recommendation from a Magistrate Judge, 2006 WL 1509061 at * 6-8, which recommended,
*inter alia*, that a claim based on an alleged incomplete Title V permit application not be dismissed.   Subsequent
developments in the law, both procedural and substantive, convince the Court that this decision is no longer correct.

provides that such challenges must be presented to EPA and the Court of Appeals.  *See*

*Dairyland Power*, 2010 WL at 4294622 * 17:

> To the extent that plaintiff is challenging defendant's submission of allegedly
> incomplete permit applications that resulted in defective Title V permits, I agree
> with defendant that plaintiff was required to utilize the process set forth in §
> 7661d. As discussed above, under that section any person who objects to the
> issuance of a permit or renewal permit may petition the EPA administrator.
> Judicial review of the administrator's decision is available only through the
> applicable court of appeals, not in the district court. 42 U.S.C. §§ 7661d(b)(2),
> 7607. *Reliant Energy,* 2009 WL 3234438, at *19 (dismissing plaintiff's claim
> based on defective Title V permit for lack of subject matter jurisdiction); *BP
> Amoco Chemical Co. v. Flint Hills Resources, LLC,* 615 F.Supp.2d 765, 777
> (N.D. Ill. 2009) (same).

In summary, the Clean Air Act does not incorporate PSD requirements into Title V

permits, but instead carefully distinguishes violations of permits issued under the Title V

"subchapter" from violations of preconstruction permits obtained under the PSD program.  A

Title V permit application was, in fact, submitted and a facially valid Title V permit was, in fact,

duly issued in 2004 for operation of the Plant.   The Current Owners cannot be held liable for the

alleged deficiencies and omissions in the underlying application submitted by the Former

Owners.  Accordingly, the Title V claims will be dismissed in their entirety.[16]


C.  State Law Claims

In addition to the federal Clean Air Act claims, PADEP and New York allege violations

of the Pennsylvania Air Pollution and Control Act ("APCA") and the Pennsylvania SIP, and

common law public nuisance.  These claims were not thoroughly developed (*see* Intervenors'

Brief at pp. 43-44), and they essentially track the federal claims.

The APCA, 35 P.S. § 4002, declares Pennsylvania's policy "to protect the air resources

of the Commonwealth to the degree necessary for the (i) protection of public health, safety and

---

[16] The Court need not reach Defendants' "permit shield" defense based on 42 U.S.C. § 7661c(f).

well-being of its citizens; (ii) prevention of injury to plant and animal life and to property; (iii)

protection of the comfort and convenience of the public and the protection of the recreational

resources of the Commonwealth; (iv) development, attraction and expansion of industry,

commerce and agriculture; and (v) implementation of the provisions of the Clean Air Act in the

Commonwealth."  Section 4006(c) provides that PADEP "is authorized to require that new

sources demonstrate in the plan approval application that the source will reduce or control

emissions of air pollutants, including hazardous air pollutants, by using the best available

technology."  The APCA implementing regulations, 25 Pa. Code §§ 121-141, also constitute the

PA SIP and are promulgated pursuant to both the APCA and the federal Clean Air Act.  In effect,

the state and federal enforcement efforts are parallel.  As explained in *Commonwealth of*

*Pennsylvania v. Environmental Protection Agency*, 500 F.2d 246, 262 (3d Cir. 1974):

> In enacting the Clean Air Amendments of 1970 Congress created an interlocking
> governmental structure in which the Federal Government and the states would
> cooperate to reach the primary goal of the Act ... Under its provisions, state and
> local governments retain responsibility for the basic design and implementation of
> air pollution strategies, subject to approval and, if necessary, enforcement by the
> Administrator. We believe that this approach represents a valid adapt[at]ion of
> federalist principles to the need for increased federal involvement.

*See also PADEP v. Pennsylvania Power Co.*, 416 A.2d 995, 998 (Pa. 1980) (describing adoption

of PA SIP pursuant to federal-state regulatory partnership and dismissing constitutional

challenge to SO2 standards).

The PA SIP addresses construction permits separately from operating permits.  25 Pa.

Code § 127.11 states, in relevant part, "a person may not cause or permit the ***construction*** or

***modification*** of an air contamination source . . . unless the construction, modification,

reactivation or installation has been approved by the Department."  This is analogous to the PSD

pre-construction permit program.[17]   Indeed, Plaintiffs represent that the PA SIP is identical to the

federal PSD program in all respects.  PADEP and New York Complaint ¶ 55.  By contrast, 25

Pa. Code § 127.402(a), which parallels the Title V program, states, in relevant part:  "A person

may not **_operate_** a stationary air contamination source **_unless the Department has issued to the_**

**_person a permit to operate the source_** under this article in response to a written application for a

permit submitted on forms and containing the information the Department may prescribe."  25

Pa. Code § 127.443 (formerly § 127.21) explicitly addresses the incorporation of pre-

construction permits into "Operating permit requirements":

> (a) A person may not cause or permit the operation of a source the construction,
> modification or reactivation of which, or the installation of an air cleaning device
> on which, is subject to § 127.11 (relating to plan approval requirements), **_unless_**
> **_the Department has issued a permit to operate_** the source.

> (b) The permit shall be issued with the condition that the source shall operate in
> compliance with the plan approval, the conditions of the plan approval and the
> conditions of the **_operating permit_**. The Department may issue the permit with
> additional appropriate conditions.

> (c) **_The Department will not issue an_** **operating** **_permit unless the source was_**
> **constructed** **_in accordance with the plan approval_** and the conditions of the plan
> approval.

Plaintiffs argue that this provision required the Former Owners to obtain an operating permit

after the projects at issue.  The fundamental flaw in this argument, however, is that the Former

Owners <u>did</u> apply for, and PADEP <u>did</u> issue, an operating permit for the Plant.[18]  Where the pre-

construction permitting process is never triggered, the plan approval and conditions that

---

[17] Pennsylvania did not promulgate its own PSD regulations.  Instead, the federal regulations at 40 C.F.R. Chapter
52 have been adopted in their entirety and incorporated into the Pennsylvania SIP.  25 Pa. Code § 127.83.
[18] Under Plaintiffs' theory, it appears that PADEP wrongfully issued the Title V permit in violation of § 127.443(c).

hypothetically might have been created during that process never materialize, and therefore, are not incorporated into the operating permit.[19]

Plaintiffs also point to 25 Pa. Code § 127.445, which provides that an operating permit may be issued to an existing and operating source that is out of compliance.  However, this provision does not create a viable avenue for this post-hoc challenge to projects from the early 1990s because the predicate assumption – that the operating source is out of compliance – has never been proven.  To the contrary, the Current Owners have possessed a facially valid operating permit since 2004 and were not on notice that the Former Owners had allegedly failed to obtain a preconstruction PSD permit.

Plaintiffs contend that the Pennsylvania SIP imposed ongoing PSD emissions limitations on the Plant.  Three cases have concluded that the relevant state implementation plan contained language stating that the PSD requirements were ongoing. *See Nat'l Parks 6th Cir.*, 480 F.3d at 419 (under Tennessee SIP, obligation to obtain construction permit is ongoing, even post-construction).  The Tennessee SIP provides, in relevant part:  "In the case where a source or modification was constructed without first obtaining a construction permit, a construction permit may be issued to the source or modification to establish as conditions of the permit, the necessary emissions limits and requirements to assure that these regulatory requirements are met." Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e).  *See also Sierra Club v. Portland General Electric Co.*, 663 F.Supp.2d 983, 992–94 (D. Or. 2009) (Oregon SIP provides that no source may construct or operate without an ACDP, the Oregon equivalent of a PSD permit); *United States v.*

---

[19] Plaintiffs also point to 35 P.S. § 4009.3, which states: "Each day of continued violation and each violation of any provision of this act, any rule or regulation adopted under this act or any order of the department or any condition or term of any plan approval or permit issued pursuant to this act shall constitute a separate offense and violation." There is no parallel "continuing violation" provision in the federal Clean Air Act.  This provision is not implicated because there is no underlying violation of the APCA or PA SIP.  To the extent Plaintiffs contend that § 4009.3 provides an independent cause of action, the Court declines to exercise supplemental jurisdiction.  The Court has concluded that all federal claims must be dismissed, and this would present a novel and complex issue of state law. 28 U.S.C. § 1367(c).

*Duke Energy Corp.*, 278 F.Supp.2d 619, 652 (M.D.N.C. 2003), vacated in part 2010 WL 3023517 (M.D.N.C. 2010) (North Carolina and South Carolina SIPS required integrated construction and operating permits).

Under the Pennsylvania SIP, there is no such integration of construction and operating permits.  In that regard, the Pennsylvania SIP is more similar to the state SIPs in which courts have held that no incorporation was intended.  *See Nat'l Parks 11th Cir.*, 502 F.3d at 1325 (distinguishing Tennessee SIP and finding no ongoing duty to apply BACT where Alabama SIP "did not provide a way for a party who had undertaken a modification to obtain ... a determination [of BACT] outside the preconstruction permitting process"); *Otter Tail*, 615 F.3d at 1017 (South Dakota SIP imposed no ongoing duty to apply BACT and was distinguishable from Tennessee SIP); *Midwest Generation*, 2011 WL 1003916 at * 4-5 (Illinois SIP does not bar *operation* of plant without *construction* permit) (emphasis in original).  In summary, the Court concludes that the claims under the ACPA and Pennsylvania SIP are duplicative of the federal Clean Air Act claims and must be dismissed.

The public nuisance claim is also without merit.  Pennsylvania has enacted a "public nuisance" statute, 35 P.S. § 4013, which states:

> A violation of this act or of any rule or regulation promulgated under this act or any order, plan approval or permit issued by the department under this act shall constitute a public nuisance. The department shall have the authority to order any person causing a public nuisance to abate the public nuisance. In addition, the department or any Commonwealth agency which undertakes to abate a public nuisance may recover the expenses of abatement following the process for assessment and collection of a civil penalty contained in section 9.1. Whenever the nuisance is maintained or continued contrary to this act or any rule or regulation promulgated under this act or any order, plan approval or permit, the nuisance may be abatable in the manner provided by this act. Any person who causes the public nuisance shall be liable for the cost of abatement.

In *American Electric Power Co. v. Connecticut*, 131 S. Ct. 2527 (June 20, 2011), the United States Supreme Court held that the Clean Air Act preempted federal common law nuisance claims as a means to curb emissions from power plants, but did not rule on the availability of a state law nuisance claim.  The Supreme Court noted that the issue would turn "on the preemptive effect of the federal Act."  *Id.* at 2540.

In *North Carolina, ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291, 303 (4th Cir. 2010), the Court of Appeals for the Fourth Circuit rejected a very similar state law public nuisance claim against power plants.  The Court held that public nuisance claims are preempted because they threaten to scuttle the comprehensive regulatory and permitting regime that has developed over several decades.  The Court reasoned, in pertinent part:

> A field of state law, here public nuisance law, would be preempted if "a scheme of federal regulation ... [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Here, of course, the role envisioned for the states has been made clear. Where Congress has chosen to grant states an extensive role in the Clean Air Act's regulatory regime through the SIP and permitting process, field and conflict preemption principles caution at a minimum against according states a wholly different role and allowing state nuisance law to contradict joint federal-state rules so meticulously drafted.

*Id.* at 303 (citations omitted).[20]  *Accord United States v. Questar Gas Mgt. Co.*, 2010 WL 5279832 (D. Utah 2010).

In this case, it is clear that both the federal Clean Air Act and the Pennsylvania Air Pollution Control Act represent comprehensive statutory and regulatory schemes that establish the standards by which grandfathered power plants must reduce their emissions of air pollutants.  Pennsylvania has a statutorily defined role through the SIP and permitting process.  Accordingly, common law public nuisance claims are preempted and will be dismissed.

---

[20] The Court noted, but found unpersuasive, the Clean Air Act's savings clause, which states that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." 42 U.S.C. § 7604(e).

D.  Leave to Amend

If a civil rights complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004); *accord Grayson v. Mayview State Hosp.*, 293 F.3d 103 (3d Cir. 2002). A district court must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend. *Id.*  In non-civil rights cases, however, a plaintiff must seek leave to amend and submit a draft amended complaint.  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252-53 (3d Cir. 2007).  Plaintiffs have not sought leave to amend in this case and it appears to the Court that such an effort would be futile.


Conclusion

For the reasons set forth above, the motions to dismiss will be **GRANTED**.  The Court appreciates Plaintiffs' frustration that the expectations of the PSD program have not been achieved as to the Homer City plant and that society at large continues to bear the brunt of significant SO2 emissions from that grandfathered facility.  Nevertheless, the Court must adhere to the plain text of the Clean Air Act.   An appropriate Order follows.


McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:11-cv-19** |
| **v.** | ) |
| | ) **ORDER OF COURT** |
| **EME HOMER CITY GENERATION L.P.,** | ) |
| **HOMER CITY OL1 LLC,  HOMER CITY OL2** | ) |
| **LLC, HOMER CITY OL3 OLC, HOMER CITY** | ) |
| **OL4 LLC, HOMER CITY OL5 LLC, HOMER** | ) |
| **CITY OL6 LLC, HOMER CITY OL7, HOMER** | ) |
| **CITY OL8, NEW YORK STATE ELECTRIC** | ) |
| **AND GAS CORPORATION and** | ) |
| **PENNSYLVANIA ELECTRIC COMPANY,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| ——————————————— | ) |
| **COMMONWEALTH OF PENNSYLVANIA,** | ) |
| **DEPARTMENT OF ENVIRONMENTAL** | ) |
| **PROTECTION and STATE OF NEW YORK,** | ) |
| | ) |
| **Plaintiffs-Intervenors,** | ) |
| **v.** | ) |
| **EME HOMER CITY GENERATION L.P., et al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| ——————————————— | ) |
| **STATE OF NEW JERSEY,** | ) |
| | ) |
| **Plaintiff-Intervenor,** | ) |
| **v.** | ) |
| **EME HOMER CITY GENERATION L.P., et al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

## ORDER OF COURT

AND NOW, this 12th day of October, 2011, in accordance with the reasoning in the

foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that

EME HOMER CITY GENERATION L.P.'S MOTION TO DISMISS (Doc. No. 85);

DEFENDANTS HOMER CITY OWNER-LESSORS' MOTION TO DISMISS (Doc. No. 87);

NEW YORK STATE ELECTRIC & GAS CORPORATION'S MOTION TO DISMISS (Doc.

No. 88); and PENNSYLVANIA ELECTRIC COMPANY'S MOTION TO DISMISS (Doc. No.

91) are **GRANTED**.  The Complaints are **DISMISSED** with prejudice and the clerk shall docket

this case closed.


BY THE COURT:

s/Terrence F. McVerry
United States District Judge


cc:     **Paul E. Skirtich, Esquire**
        Email: paul.skirtich@usdoj.gov
        **Katherine L. Vanderhook, Esquire**
        Email: katherine.vanderhook@usdoj.gov
        **Cara M. Mroczek, Esquire**
        Email: cara.mroczek@usdoj.gov
        **John W. Sither, Esquire**
        Email: John.Sither@usdoj.gov

        **Michael J. Heilman, Esquire**
        Email: mheilman@state.pa.us
        **Michael J. Myers, Esquire**
        Email: michael.myers@ag.ny.gov
        **Susan C. Von Reusner, Esquire**
        Email: susan.vonreusner@ag.ny.gov

**Jon C. Martin, Esquire**
Email: jon.martin@dol.lps.state.nj.us
**Jung W. Kim, Esquire**
Email: jung.kim@dol.lps.state.nj.us
**Lisa J. Morelli, Esquire**
Email: lisa.morelli@dol.lps.state.nj.us

**James M. Jones, Esquire**
Email: jmjones@jonesday.com
**Andrew N. Sawula, Esquire**
Email: asawula@schiffhardin.com
**Kevin P. Holewinski, Esquire**
Email: kpholewinski@jonesday.com
**Rebekah B. Kcehowski, Esquire**
Email: rbkcehowski@jonesday.com
**Daniel E. Reidy, Esquire**
Email: dereidy@jonesday.com
**Brian J. Murray, Esquire**
Email: bjmurray@jonesday.com
**Stephen J. Bonebrake, Esquire**
Email: sbonebrake@schiffhardin.com

**Chet Thompson, Esquire**
Email: CThompson@crowell.com
**Jeffrey Poston, Esquire**
Email: JPoston@crowell.com
**Peter T. Stinson, Esquire**
Email: pstinson@dmclaw.com
**W. Alan Torrance , Jr., Esquire**
Email: atorrance@dmclaw.com

**Kevin P. Lucas, Esquire**
Email: klucas@mmlpc.com
**Benjamin S. Lippard, Esquire**
Email: blippard@velaw.com
**George C. Hopkins, Esquire**
Email: ghopkins@velaw.com
**Kevin A. Gaynor, Esquire**
Email: kgaynor@velaw.com
**Stefanie A. Lepore, Esquire**
Email: slepore@velaw.com

**David H. Quigley, Esquire**
Email: dquigley@akingump.com

**Nash E Long , III, Esquire**
Email: nlong@winston.com
**Paul E. Gutermann, Esquire**
Email: pgutermann@akingump.com
**T. Thomas Cottingham , III, Esquire**
Email: tcottingham@winston.com